M. W. WILKERSON *v.* J. PRESTON BISHOP, et al.

### DURESS.

1. A state of fear which would fall short of duress in time of peace and the prevalence of law, might well constitute duress in a state of war, epidemic, or other condition of public fear or exasperation. Quoting Jones v. Thomas, 5 Coldw. 659.

THE SAME.

2. Whether a person be under duress or not depends upon the amount of fear and terror operating upon his mind at the time he commits the act sought to be avoided.

THE SAME.—*Burden of proof.*

3. Notwithstanding the difficulty of proving his own feelings, the burden is upon the party who seeks to avoid an act upon the ground of duress.

THE SAME.

4. To constitute duress, the danger must not only exist, but it must be shown to have actually operated upon the mind, and to have constituted the controlling motive for the act sought to be avoided.

THE SAME.—*Confederate money.*

5. At a time when Confederate money was the general currency of the country, the fact that it was dangerous to refuse to take it, will not of itself be sufficient to avoid a satisfaction in Confederate money on the ground of duress.

Wilkerson v. Bishop.

ANDREWS, J., delivered the opinion of the court:

In the year 1857, the complainant, Wilkerson, made an agreement with the defendant, J. Preston Bishop, to sell to him a tract of land in Anderson county, and executed to Bishop a bond conditioned for the conveyance to him of the premises.

To secure the payment of the stipulated purchase money, which was seventeen hundred dollars, Bishop executed to Wilkerson his four promissory notes, payable in bankable money, and at different dates, the last note becoming due on February 1, 1862.

These notes were not paid at maturity, and in June, 1863, an arrangement was made between one Joseph Bishop, as agent for J. Preston Bishop, complainant Wilkerson, and one McIntyre, by which McIntyre, in consideration of two thousand dollars, was to become the purchaser of the land.

McIntyre was to pay the amount due upon Bishop's notes to Wilkerson, pay the balance of the two thousand dollars to Bishop, and Wilkerson was to execute a deed for the premises to McIntyre. This arrangement was carried into effect on the 1st day of July, 1863. McIntyre paid to Wilkerson fifteen hundred and thirty dollars in Confederate money, and assumed the payment of a debt of three hundred and twenty-six dollars due from Wilkerson to Dr. Coward. The notes of Bishop were delivered up, and Wilkerson executed and delivered to McIntyre a deed for the premises.

The rebel authorities at this time held possession of East Tennessee, and the country was under military occupation and control. The bill in this cause was filed by Wilkerson on the 30th day of November, 1864, for the purpose of setting aside the illegal payment in Confederate money,

and the deed make to McIntyre, upon the ground that complainant acted under duress in the transaction, and to enforce his vendor's lien upon the premises conveyed, for the unpaid purchase money.

The allegations in the bill in regard to the duress, are that Joseph Bishop, as agent for J. Preston Bishop, called on the complainant and requested to pay the notes in Confederate money ; that complainant expressed an unwillingness to receive the Confederate money and execute title ; when said Joseph Bishop told complainant that Confederate money was bankable, and he was bound to receive it ; and that in addition to that, persons had been sent South by the Confederate authorities for refusing to take Confederate money, and made other insinuations which intimidated complainant, knowing, as he did, the vindictiveness of the rebels and the disloyalty of the Bishops ; that he executed the title under duress and fear of imprisonment, and would not have received the money or have executed the title had he not feared the rebel authorities and desired his personal liberty.

The answers of Joseph Bishop and McIntyre, the oath being waived, fully deny all the allegations of the bill in regard to duress. The bill was taken as confessed against J. Preston Bishop, who is a non-resident, and the Chancellor, upon pleadings and proofs, decreed that the reception of the Confederate money by the complainant, and the execution by him of the deed to McIntyre, were under duress and fear ; that the deed to McIntyre be set aside ; that the payment and surrender of the notes was a nullity, and that the complainant have a decree for the amount of the notes against J. Preston Bishop, which amount should be a lien on the land conveyed ; and directed a sale of the land to satisfy the same, and that defendants pay the costs.

From this decree McIntyre and Joseph Bishop have appealed to this court.

The testimony in the case shows that at the time of the transaction in question, Confederate money was very much depreciated in value; that it was generally understood in the community that E. Kirby Smith, the General in command of the rebel forces in this region, had issued an order requiring all persons to accept Confederate money in payment of debts, and that disobedience to the order might subject persons, and especially Union men, at the pleasure of the military authorities, to summary transportation to the South and imprisonment. Men of known Union sentiments were objects of suspicion, and their situation was one usually of some peril, as was generally understood. The testimony of several witnesses tends to show that it was understood that for a Union man to refuse to accept payment of a debt in Confederate money was attended with some risk. Meanwhile, Confederate money was the principal currency of the country, and was paid and received by all parties in transactions in which currency was necessary.

It is very difficult to declare what circumstances of fear and terror operating upon the minds of a party shall constitute such duress as shall avoid a contract; for, from the nature of the case, no testimony can show with certainty what the actual mental condition of the party was. (a) "The stress of terror or force upon the creditor, which would fall much short of duress in the legal sense, in the condition of peace, the prevalence of law and the readiness of the officers of the law and of the people to

(a) Duress consists in the *State of mind* produced by the imprisonment or other harhship. A person may be in prison and not under duress. Blair v. Caffman, 2 Tenn., 176, 177.

give protection and redress to the injured, and when the sense of security and safety gives confidence and courage, may fairly and properly be deemed duress in the midst of civil war, when soldiers and marauders traverse the country, uncontrolled and uncontrollable, and the general terror so paralyses every man that none will give aid or defense to another; and when a temper or violent intolerance, as an epidemic, exasperates the people against those who incur their displeasure, and unpopular creditors, or persons doing unpopular acts, are justly overwhlemed with the sense of wrong, peril and helplsseness." Jones v. Thomas, 5 Coldw., 469.

Still from the fact, if proved, that it was generally understood in the community that it was unsafe to refuse to accept Confederate money, and that such refusal would subject the party refusing to peril of imprisonment, we are not authorized to infer that every act of reception of such currency was under duress; for the fact remains that it constituted the ordinary currency of the country, and that voluntary transactions were usually carried on by means of it.

Because it is shown that it was dangerous to refuse a particular kind of currency, it does not follow that every man who receives it is impelled by fear of danger. When threats or other attempts at intimidation are proven, then the fact of the danger to which the party disregarding the threat is exposed, is a fact, which, proven in connection with the threat, may complete the duress. But the mere proof of the existence of the danger without proof that it in fact operated upon the mind of the party, or that such threats or other means were employed as must tend to cause it to operate upon the mind, will not be sufficient to establish the fact of duress. If it were otherwise, every contract,

Wilkerson v. Bishop.

the consideration of which was Confederate money, entered into during the reign of terror spoken of by the witnesses in this case, might be set aside. To constitute duress, the danger must not only exist, but must be shown to have actually operated upon the mind, and to have constituted the controlling motive for the performance of the act sought to be avoided.

It must be difficult in many cases for the complainant to prove affirmatively the effect and operation of external circumstances upon his own mind; but the burden of proof is, and ought to be, upon him to establish the fact of duress by direct or circumstantial evidence; and it cannot be permitted to set aside solemn contracts, merely because the complainants may have made them under duress.

In the present case the evidence does not sufficiently show that the complainant acted under duress in receiving the Confederate money and executing the deed in question. There is no evidence whatever that any threats were made or insinuated by any one to induce his action, except from the statements of complainant himself, made out of the presence of the defendants, and not apart of the *res gestea*. Complainant made no objection at the time the Confederate money was paid and the deed delivered, and there is evidence that he had previously expressed his anxiety that the sale should be consummated. He knew that Dr. Coward, on the same occasion, declined to receive Confederate money in satisfaction of a lien which he held upon the land, and complainant himself made an arrangement with McIntyre, that McIntyre should pay off this lien in bank notes. The complainant, about the same time, received payment in Confederate money without objection, of a debt due to him from another party.

Wilkerson v. Bishop.

He voluntarily invested most or all of the currency received by him in tobacco, a circumstance which may be looked to as tending to show whether he willingly accepted it at the time when it was delivered to him, or subsequently, in satisfaction of his demand. 5 Caldw., 470. (*b*)

There is in fact no allegation in the bill that the complainant did not make use of the Confederate money, or that it has remained in his hands, or that he has sustained any loss or damage in the transaction whatever.

We are unable to find sufficient evidence in this record to sustain the decree of the Chancellor, and the decree must be reversed and the bill dismissed.

### *Decree reversed and Bill dismissed.*

(*b*) Evidence that the party taking the money under the alleged duress, afterwards invested it, is proper to go to the jury. Thomas v. Rhodes, 5 Cold. 469, 470.